May it please the Court, good morning. James Chavez of Federal Defenders of San Diego appearing on behalf of the opponent, Mr. Javier Garcia-Villegas. Your Honor, we're asking this Court to reverse the conviction and sentence of Mr. Javier Garcia-Villegas because the government failed to do its job in this case with regards to alienage and with regards to taking statements from Mr. Garcia-Villegas. And there's three particular issues I would like to discuss with the Court this morning if we have time. The first is the government's failure to sufficiently corroborate Mr. Garcia-Villegas' admissions of alienage. The second issue is the government's failure to provide Mr. Garcia-Villegas with proper Miranda warnings when he was taken into custody in the field and asked incriminating questions. And the third issue is the inadequacy of the warnings that were provided to Mr. Garcia-Villegas once he was... May I ask where is the petitioner now? I do not have any contact with him. Last I know, he was in the custody of the... I have some information that his probation period expires on the 10th of June. Is that right? I do believe that would be correct, Your Honor. Well, with respect to the alienage, isn't this even a stronger case than Hernandez where it was held to be enough? Well, I guess, I mean, starting with Hernandez, I mean, the Court in Hernandez, I mean, had the opportunity to say that admissions of alienage plus mode of entry were sufficient to prove alienage. And the Court specifically said that we're not going to do that, that alienage... that we're going to rely on the issue of deportation, that the fact that he had previously been deported was what was sufficient evidence to prove evidence in that case. And the Court said that, you know, the mode of entry was some evidence, but the Court did not say that it was sufficient evidence to prove it. They didn't need it in that case, so really, that's just the victim. In this case, we don't need it. In Hernandez, we don't need it. Okay, you don't need it in Hernandez. It can't be used. I mean, the Court definitely did not say that it couldn't be used, but the Court could have said that it could have been used. It could have, but it didn't. But it didn't, and the Court didn't rely on that. And I think that there's good reasons that the Court relied on a deportation rather than just on, you know, whether or not he jumped over a fence. Why? Well, because the issue of alienage, it's a complicated question. You see somebody jumping over a fence, and you wonder why you don't think that's confirmation? I mean, to prove someone's a citizen, to prove somebody is an alien, depends upon where they're born. It depends upon when they're born. It depends upon when they've lived in the United States. What you're getting here is corroboration. He wasn't born in the United States. He was born in Mexico. All you need is a little inkling that that's true. I mean, coming in in a totally unconventional way was plenty of proof. Well, I think that, I mean, as I cited in my briefs, there are other reasons that people would seek to come into the United States at a non-court of interest. I mean, an individual who might have a criminal record, who knows that there's a warrant out for their arrest, might not want to talk to law enforcement officials. Well, that's true, but that wasn't true in this case. Exactly. So, I mean, that was not a reason. Well, it's not a reason. It's showing some other reason for going in the unconventional way. Maybe you have a point, but he didn't. Well, I mean, in this case there was another individual with him. I mean, nothing in the record suggests that, but maybe, you know, he said the other person was helping him get into the country. There were eyewitnesses here. There were border patrol officers that saw him within feet of the fence. Yes. And then hiding behind the bush. Yes. I mean, it's a direct eyewitness observation here. Yes. I mean, there is no, I mean, doubt that, I mean, the government, law enforcement agents saw him come over the fence. The only real question is whether the motive, the unconventional and unlawful motive entry is sufficient corroboration of his admission. It's true. And I think that, I mean. And then the sub-question is whether Hernandez was dictum or was a holding as to whether that is or is not enough. Isn't that pretty much the narrow balance of what we have to decide? Yes, Your Honor. And I think that, I mean, since, I mean, the Supreme Court said in opera back in 1954 that substantial independent evidence, which would tend to establish the trustworthiness of a statement. And does coming over a fence make someone a United States citizen? Does it make someone an alien? And I think if you look at the laws of alienation, the laws of citizenship, it really doesn't have anything to do with it. And I think that, I mean, I mean, this court has held before that a deportation order, when someone's gone to see an immigration judge, someone who's a specialist in the issue of citizenship, of alienage, when that person has decided that person's not a United States citizen, that's still not enough to prove for the government to meet its burden of proving alienage in a criminal case. And so I think that there's good reasons to require substantial independent evidence if the government is going to meet its burden of proving alienage in a criminal case. And I just don't think that coming over a fence is enough. And I think that's what the court in Hernandez concluded as well, and that's why they relied upon the deportation order in that case. If the court doesn't have any other further questions on that issue. Not at the moment, counsel. You can reserve your time. Well, I was going to move on to the other issues of whether or not Mr. Garcia-Villegas should have been provided his Miranda warnings in the field. And I think the issue comes down to whether or not he was in custody. And I think that, I mean, common sense tells us he was in custody. He was ordered, I mean, when we think of an arrest, this is what we think of. He was told to come out from where he was hiding. He was told to put his hands in the air. He was put in handcuffs, and he was taken to the police car. That's an arrest. And there's some other cases from this court that have been discussed in the briefing. Well, in a Terry Stott situation, aren't there some cases that say that you can handcuff to get the individual to a safe point, that kind of thing? Yeah, there are definitely cases that say that. I mean, in terms of the issue of safety, Mr. Garcia-Villegas was not. He was nothing but obedient in this case. And to the extent that this area may have been dangerous, I mean, those sort of general allegations by the arresting officer at trial are somewhat undermined by the fact that he only moved him 10 to 15 yards. And so there was, in Cervantes Flores, where the individual ran, where the individual had to be subdued, and that justified the use of handcuffs to effectuate the Terry Stott. There's none of that. Mr. Garcia-Villegas didn't run. He didn't pose a danger to the officer. He, as an individual, did not do anything in particular that would justify the use of handcuffs merely for a Terry Stott. And so in this case, the use of handcuffs, the show of force, the movement of him, all of that adds up to custody, to an arrest. That's what we think about when we think of an arrest. And so on the narrow issue of custody, I would say that, I mean, he was in custody. I mean, I think the other difficult case for us to deal with, for Mr. Garcia-Villegas to deal with is when he was read administrative rights at one stage, and then eventually he was read as Miranda rights. Yeah, I mean, if the Court would like to, yeah, talk about the third issue that I'd like to talk about is that the adequacy of the warnings when he was taken back to the Border Patrol Station. And under San Juan Cruz, those warnings were inadequate. As the Court just stated, Mr. Garcia-Villegas was originally read his administrative rights, which told him that if he needed a lawyer, they would provide him a list of attorneys that might help him out for free or would help him, that might help him for free. And then 40 minutes later, they tell him, no, actually, we're going to process you for a federal offense, and now if you can't afford one, we're going to appoint one. And I think what's critical here is that he was never told he had the right to a free attorney. He was never told he had the right to an attorney at no cost. And that's exactly what happened in San Juan Cruz. The warnings here didn't clearly advise him of it. He was never clearly told to disregard his administrative rights, his administrative rights that are in direct conflict with his Miranda rights. And if the Court doesn't have any other further questions at this point, I would reserve my time for rebuttal. If you do so, counsel, we'll hear from the government. George Manahan, United States. May it please the Court. Starting with the issue of the corroboration of alienage, the main distinction between the facts of this case and the facts of Hernandez are that in Hernandez, the only corroboration the Court was considering was the defendant's admission that he came into the United States by illegally jumping over a fence. Hernandez was found in jail, in a state jail, and then interviewed by an immigration officer. Now, admissions are great evidence. We want to use admissions to prove guilt. But we have this corroboration requirement because we do have a fear of false confessions, mainly because we fear that overzealous police officers will use bullying tactics to get confessions if we rely solely and exclusively on confessions of admissions. So we require some corroboration. Well, in Hernandez, the Court said, yes, it was some corroboration that the defendant also admitted that he illegally entered by hopping over a fence. But obviously, if your concern is police bullying confessions out of people, requiring them to just bully them a little bit more to get another confession of illegal entry isn't quite the kind of corroboration we're looking for. That's not the facts of this case. This case, you know, the scope operator sees the individual coming over. Why is it any different when they're seen? I mean, Hernandez says the fact that Hernandez entered the United States by scaling the border fence rather than via an established border checkpoint is an indication that he entered the United States illegally. And I'm paraphrasing, but the Court doesn't hold that the mode, we do not hold that the mode of a defendant's entry is sufficient corroboration, even though it provides some evidence. And why isn't opposing counsel's argument a forceful one in this regard? Plenty of people sneak over the border. I mean, citizens go to Mexico and bring back illegal drugs and that happens all the time or bring back illegal aliens or have all kinds of reasons to sneak across the border, and they can be seen doing it. But the fact that they sneak across the border doesn't make them non-citizens. And alienage can be relatively complicated, as we know, depending on natural parents divorced, all that stuff. So why is that substantial evidence of corroboration? There's a number of issues raised by your question. First of all, let's talk about how much substantial evidence is required for corroboration. Opper said that all that you need is evidence which provides an inference of the truth of the admission or confession. Corona-Garcia said all it needs to do is to fortify, augment, or support the truth. So we don't need evidence that, independent of the admission of alienage, proves alienage. Otherwise, we'd just be throwing out the admission. Second, the reason why it's important that he was seen coming over the fence rather than just admitting it is because it takes care of the entire purpose of corroboration to begin with, which is we don't want police officers forcing confessions out of people. That's why it's a very different fact situation than the fact situation in Hernandez. Now, as to the point of, well, alienage is a difficult issue, yes, there are derivative citizen claims that could be made by people charged with illegal entry and illegal reentry, and sometimes those are difficult issues. But this Court has made clear that the fact finder doesn't consider those issues unless the defendant puts in some evidence. Here, there was no evidence that there was any possibility of a derivative citizen claim put in by the defendant because the defendant didn't raise the fence. The only evidence was that he admitted he was born in Mexico, he admitted that he was a Mexican citizen, he admitted that he had no legal right to be in the United States, and those admissions were corroborated in that there was an inference that they were true, they were fortified by the facts that he entered the United States by climbing two fences, which I tried to describe in detail in my papers. It doesn't really matter if it's one or two, does it? Well, I think it matters when, you know. It matters that he's not crossing where he's supposed to, he's sneaking across. Well, you have to be pretty motivated to come in, to climb, you know, that tall fence with the greater than vertical slope with the razor wire on top. So would the answer to this case be different if he had crossed where there was a hole in the fence and he could walk through? I think that in and of itself would be sufficient corroboration. Okay. Here we have more corroboration. I guess I don't understand why two fences are better than one, for your point. Go ahead. Okay. Regarding the field admission, the question of whether the Miranda rights were required comes down to, in the first place at least, was he in custody? And as was stated in United States v. Butler, there are many situations in which a defendant or a suspect is, at least temporarily, not free to leave, but he's not in custody for purposes of Miranda. And one of those situations is a Terry stop. And in Cervantes Flores, we have a situation where, similar to this, an individual is seen near the border. He's placed in handcuffs and he's asked certain alien questions. And the court found that he wasn't in custody for Miranda purposes. This was a Terry stop. In this situation, I would say that the factors that we're supposed to look at to decide whether a Terry stop has crossed the line into custody for purposes of Miranda, which are listed in United States v. Butler, the extent that he's confronted with evidence of his guilt. There was no confrontation. There was no evidence of his guilt. The evidence was merely that the officer said, you know, come out from behind a bush, walked him over to the car, started asking him some questions about his alienation. He didn't start saying, well, you just illegally climbed fences and, you know, you were seen. So that means you must be guilty. No, none of that was occurring. The duration of the detention. The evidence is clear that he gets the call from the scope operator. It takes him about a minute to get to the area. He looks around for about 10 seconds, sees the individual, gets him out, puts him in handcuffs, walks him into the car, asks him a couple questions. The whole process takes about a minute. So it's a very short period of time. The physical characteristics. This doesn't occur in a police station. It doesn't occur in a closed room. It's out in the open. The language used. There's nothing to suggest that the agent was anything but, you know, cordial and simply asking the normal routine questions about alienation that he's asked time and again of individuals he encounters near the border where there's some suspicion that they're not legally able to be in the United States. Regarding the Seabird issue, first I would like to point out that this should be a plain error review of that issue because it was not raised before the magistrate, and therefore the magistrate had no chance to rule on the crux of the issue in Seabird, which is was there a deliberate use of a two-step process? The magistrate judge never had a chance to rule on that because it simply wasn't raised. And the court, you know, was supposed to look at objective and subjective evidence. Well, there was no subjective evidence of a deliberate use. I would argue that the objective evidence doesn't prove a deliberate use, certainly not in a plain review. The warnings were given by 40 minutes apart. The setting had changed to the interview room. And with that, if there's no more questions, the United States will rest. No questions. Thank you, counsel. Mr. Chavez, you have some reserve time. Thank you. As to the first issue, the issue of alienage, the government focused a little bit on false confessions. But I don't think that's the issue here. That's not what the court was concerned about in Hernandez. I think that the issue of alienage is a unique and complicated one, and I think that it requires substantial evidence. Well, if it had been made complicated, you'd have a point. But it wasn't. There's no evidence of any doubt about his Mexican nationality. I mean, you can envision hypotheticals, but that's not the case you have. I mean, Mr. Garcia Villegas, I mean, all the evidence and records suggest that he came over to this country. First of all, he admitted there's an admission here. So we're talking corroboration, which is a much more narrow field of inquiry, isn't it? It is. I mean, the court has said that, obviously, statements of alienage are not sufficient in and of themselves, and I think that's because it's a complicated question. I mean, as a point of comparison that I put in my brief, you certainly can't just walk up to the port of entry in this country and admit you're a United States citizen and be allowed to walk in. What about Mr. Manhan's point in his argument that we're not looking for a totally independent determination, sort of beyond reasonable doubt? You're looking for corroboration, namely some evidence which tends to lend an inference of truth. Do you disagree with that standard? I think that under Lopez-Alvarez, you do need independent evidence. I mean, that's the second prong of the corroboration test. But this is certainly independent. Huh? This is certainly independent. What is? When somebody goes through two fences, that's independent. I mean, that's – but it's from the individual. I mean, and the argument is that – I mean, there is a small but not unlikely – I mean, there's a small chance that he's not an alien, that he wasn't an alien, and I mean, that happens all the time in the Southern District of California. I mean, part of my job is knowing the law of citizenship to be able to help represent it. Sure, if there were any complications, you could have shown it in this case, but there weren't. It's not our burden. It's not our burden. And I think that's why the court has previously required such corroboration of statements of alienage. Moving on to the issue of whether or not he was in custody and Cervantes Flores – in Cervantes Flores at 421 F. 3rd, 830, the court said, We have only allowed the use of especially intrusive means of effecting a stop in special circumstances, such as where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight. In this case, Mr. Garcia-Villegas didn't do anything to suggest that he would be uncooperative. He didn't do anything to suggest he was a danger. He didn't do anything to suggest he was going to run. And so, putting him in handcuffs, telling him to put his hands in the air, putting him in handcuffs, taking him to a police car, that's an arrest. The government also addressed the Kim factors. And in this case, I would suggest that the Kim factors suggest that he was in custody. The language used, he was ordered to come out of the bushes. To the extent that he was confronted with his guilt, he was caught feet from the border. I mean, I don't know what more evidence of guilt he could have been confronted with in this instance. The third issue is the physical surroundings of the area. I mean, there's nothing to suggest there was anybody around. There's nothing to suggest that Mr. Garcia-Villegas was familiar with this area. It was just him and this agent out there, an agent with a gun, an agent who had him in handcuffs. The duration of the detention, while it was a short time, an arrest has a beginning, an arrest has an end. I mean, he was taken into custody at some point in the time in which he was told to put his hands in the air, handcuffed and taken to the police car. And just the final issue is that with regard to Siebert, the magistrate judge did voir dire the interrogating agent on the issue of referencing the previous submissions of alienage during the Miranda interrogation. Thank you very much for your time. Counsel, your time has expired. The case just argued will be submitted for decision. We will hear argument next in Hilton v. Hallmark Cars.
judges: Noonan, O'scannlain, Graber